The MICA CORPORATION, Plaintiff,

v.

DELTA TRANSNATIONAL, INC., Defendant.

No. 77 Civ. 4470.

United States District Court,
S. D. New York.

March 8, 1979.

Bloom, Epstein, Wayne, Reiss & Milner, New York City, for plaintiff; Robert M. Milner, New York City, of counsel.

Reid & Priest, New York City, for defendant; Stephen H. Kinney, Jr., New York City, of counsel.

OPINION

SWEET, District Judge.

Plaintiff Mica Corporation ("Mica"), a California manufacturer of electronic components, commenced this action to recover $30,009.26 from defendant Delta Transnational, Inc. ("Delta"), a New York corporation and a financial subsidiary of the Mitsubishi Corporation, under a written guaranty of certain obligations of Optel Corporation ("Optel"), a New Jersey corporation. The complaint alleges four causes of action arising out of: a breach of a guarantee contract, equitable estoppel, and fraudulent misrepresentation. The court is

vested with diversity jurisdiction pursuant to 28 U.S.C.A. § 1332(a)(1). New York law applies because the alleged guarantee upon which this action is based arose in New York.

Mica is a manufacturer of watch components. Optel was an assembler of digital watches. Delta is an investment company.

Mica sold watch components to Optel initially in early 1975. The orders were generally small, and Mica originally sold to Optel only on a cash-in-advance basis. Subsequently, however, Mica's credit policy changed, and Optel was granted a $5,000 credit line.

In August of 1975 Arthur Diamond, Mica's comptroller, received a telephone call from Richard Corbin, Vice President and Treasurer of Optel, who requested a higher credit line. When Diamond indicated that a higher credit line was not feasible because of Optel's financial condition, Corbin replied that Delta had entered into a financing agreement with Optel and that Delta would guarantee purchases by Optel from Mica through an "Inventory Money Purchase Program" ("IMPP"). In relevant part, the agreement between Optel and Delta with respect to the IMPP provided:

"1. Optel may from time to time request in writing to [defendant] that it obligate itself to pay Optel's supplier (the 'Supplier') the purchase price of certain supplies or materials which Optel wishes to acquire (the 'Materials') from the Supplier and that [defendant] make the financing by paying the Supplier for the Materials.

"2. Accompanying each such request for a financing, Optel shall deliver to [defendant]:

(a) a copy of the proposed purchase order which Optel wishes to issue for the Materials . . .

"3. With respect to each such request for a financing, [defendant] may, in its sole discretion, either:

(a) elect to provide the requested financing, in which case it shall in writing notify Optel and the Supplier of [defendant's] undertaking to pay the Supplier for the Materials in accordance with the terms and conditions of the signed purchase order issued by Optel.

or

(b) elect not to provide the requested financing, in which case it shall promptly return to Optel all the documents delivered with respect to the requested financing. . . ."

On September 7, 1975 Corbin called Diamond to tell him that the IMPP arrangement could apply to Optel's purchases from Mica. Diamond testified that at this time he did not ask Corbin about the terms of the IMPP. On September 8, 1975 Diamond called Dr. Ishizuka, President of Delta. Diamond testified that during this conversation Ishizuka stated that arrangements had been made to guarantee Optel's purchases from Mica and that based on this conversation Diamond thought that this guarantee was to be continuing in scope. Dr. Ishizuka's deposition testimony states: "I told Mr. Diamond . . . that Delta would undertake to guarantee certain transactions . . . which Optel is to request in writing . . . and then Delta . . . might decide to enter into such guarantee in accordance with the stipulation on the purchase order, and if Delta elects to do that at that time we are supposed to notify both Optel and the supplier directly, generally by telex, sometimes by cable, specifically identifying which purchase order . . . we are making ourselves obligated to pay."[1] Although Ishizuka testified that his remarks to Diamond were cast "in general terms,"[2] and that Mr. Corbin would fill in

---

1. Deposition of Yukio Ishizuka, December 28, 1977, at 25–26. Note: by consent of all parties, this deposition was entered into evidence in lieu of a personal appearance by Dr. Ishizuka at trial.

2. *Id.*, 28.

the details,[3] he did state that he told Diamond that if Delta approved a purchase order Delta would confirm this "in a writing directly to [Mica]."[4] At any rate, Diamond told Ishizuka that he would need a letter memorializing their conversation. Ishizuka sent a letter that day indicating in part:

> In accordance with our telephone conversation, I am confirming in writing that Delta Transnational, Inc. will be guaranteeing payment for goods delivered to Optel Corporation under an inventory money purchase program as Richard Corbin of Optel explained to you.
>
> Delta Transnational will be paying you directly under the terms and conditions stipulated in purchase orders from Optel to you as shipments are received and accepted by Optel.[5]

When Diamond received this letter he showed it to Mr. Levy, Vice President of Finance of Mica, who requested written confirmation that certain preexisting purchase orders[6] were covered by Delta's guarantee. The ensuing telegram, dated September 18, 1975, indicated that those purchases were covered, and indicated that the purchase was made "under the terms of our orders A–14976–1 and A–15579–1 and our agreement with Delta Transnational, Inc." Upon receipt of the letter and telegram, Diamond approved the shipment of watch components under the two preexisting orders and under five additional purchase orders. No written approval of these five orders was requested or received from Delta.

By late December, 1975 Mica held a number of unpaid invoices from Optel. Therefore, on January 7, 1976 Diamond called Dr. Ishizuka to say that Optel's accounts were overdue and to demand payment by Delta on various purchase orders. Ishizuka responded that Delta's guarantee covered only the two purchase orders referred to in the September 18, 1975 telegram. A few days later Diamond called Noelle Thompson, a Delta employee, and was again told that Delta considered itself responsible for all shipments on the two purchase orders, but not on other shipments. At Thompson's suggestion, Diamond shortly thereafter called Corbin, who informed him that the IMPP was terminated. Corbin and Diamond proceeded to make arrangements for Optel to pay off its outstanding debts to Mica, and Diamond agreed to grant to Optel an open credit of $10,000. Optel did make payments totalling $30,000, thereby reducing the balance to $30,009.26, the sum demanded in this action. In June of 1976, however, Optel filed a petition under Chapter XI of the Bankruptcy Act. Mica subsequently filed this action to recover from Delta the unpaid debt owed it by Optel.

■ Delta's written guarantee by its terms extended only to shipments made pursuant to purchase orders A–14976–1 and A–15579–1.[7] Mica was on notice at all relevant times of the IMPP, for reference was made to it both in the September 8, 1975 letter and in the September 18, 1975 telegram. By stating that Delta would "[guarantee] payment for goods delivered to Optel Corporation under an inventory money purchase program . . .", the September 8 letter incorporates by reference the IMPP agreement between defendant and Optel. Under New York law a guarantee may consist of a separate written instrument which refers to another contract or transaction. *See 57 N.Y. Jurisprudence*, Suretyship and Guaranty, § 31, p. 235. Under the IMPP, Delta did not undertake to guarantee all purchases made by Optel; it obligated itself only to pay for certain purchases—those which it elected to guarantee by notifying Mica in writing. Delta did notify

**3.** *Id.*

**4.** *Id.*

**5.** Exhibit D–4.

**6.** These purchase orders were numbers A–14976–1 and A–15579–1.

**7.** The court finds no substantial evidence to support plaintiff's claims based on equitable estoppel, agency law, or fraudulent misrepresentation. The discussion above focuses on the breach of guarantee contract.

**432**

Mica as to shipments made pursuant to purchase orders A–14976–1 and A–15579–1, and those shipments have been paid for.

 Undoubtedly, Diamond believed in good faith that the guarantee was a continuing one, and was not disabused in that belief by Corbin, who at no time delineated the IMPP with the precision that the situation warranted. Nonetheless, there is no authority for the proposition that Corbin's lack of candor amplified Delta's undertaking. In deciding that Delta's guarantee did not extend beyond shipments made pursuant to the two purchase orders referred to above, the court is mindful of the following language of the New York Supreme Court, Appellate Division: "an instrument of guaranty must be construed as limited to the transaction involved unless it clearly shows a continuing liability." *Trade Bank and Trust Company v. Goldberg*, 38 A.D. 2d 405, 330 N.Y.S.2d 69, 71 (1972), *citing Wesselman v. Engel Co.*, 309 N.Y. 27, 127 N.E.2d 736; *100 Parkway Road, Inc. v. Johns-Manville, Inc.*, 258 App.Div. 736, 14 N.Y.S.2d 830, aff'd, 285 N.Y. 747, 34 N.E.2d 906. In *Wesselman*, the New York Court of Appeals stated, "The guarantor should not be bound beyond the express terms of his guarantee." 309 N.Y. at 30, 127 N.E.2d at 738 (citations omitted). *See also Esso International, Inc. v. American Cargo Line, Inc.*, 20 A.D.2d 868, 248 N.Y.S.2d 490, wherein the court stated, "the liability of the guarantor is to be 'strictly limited to that assumed by its terms, or, as the rule is otherwise stated, a surety is not held beyond the terms, or the strict, or the precise, or the clear, or the express terms of his contract; and the surety has the right to stand on [those] . . . terms'". *Id.* 248 N.Y.S.2d at 492, *quoting* 72 *C.J.S.* Principal & Surety § 91, pp. 569, 570.

Defendant shall, within ten days hereof, submit to the clerk of this court a judgment, on notice, consistent with this opinion.

IT IS SO ORDERED.